In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00023-CV
______________________________


CENDANT MOBILITY SERVICES CORPORATION, Appellant
 
V.
 
KENNETH S. FALCONER, Appellee


                                              

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 2000-629-A


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N

          The Gregg County house purchased by Kenneth S. Falconer turned out to be a
nightmare. Falconer purchased the house in 1999 through Cendant Mobility Services
Corporation, a relocation firm selling the property for the prior owners, the Gunnelses. 
After the purchase, and a severe drought, Falconer began to see damage to interior and
exterior walls and floors revealing serious and widespread structural flaws.


 Falconer sued
Cendant, asserting causes of action for fraud and violation of the Texas Deceptive Trade
Practices–Consumer Protection Act (DTPA), Tex. Bus. & Com. Code Ann. §§ 17.41–.63
(Vernon 2002 & Supp. 2004), claiming that Cendant failed to disclose that the house's
foundation had shown evidence of substantial movement in the past and that Cendant
provided only a portion of the relevant engineer's report for his review.


 The evidence
reveals, however, that Falconer's initials appear on each page of the previous
homeowner's real estate disclosure ("Gunnels Disclosure") and an engineer's structural
inspection report ("Downs Report").
          Finding that Cendant committed fraud and violated the DTPA, a Gregg County jury
found in Falconer's favor $32,000.00 in damages, $100,000.00 in additional damages,
$150,000.00 in exemplary damages, and $41,184.13 in attorney's fees. In its final
judgment, the trial court eliminated the exemplary damages award, ordered the sales
contract rescinded, and awarded Falconer a total recovery of $234,619.09.


 Cendant now
appeals, challenging the legal and factual sufficiency of the evidence and contending the
trial court erred in calculating prejudgment interest before applying Cendant's settlement
credit and in awarding additional damages under the DTPA in excess of the statutory
maximum. We reverse the trial court's judgment and render judgment that Falconer take
nothing.
Reviewing Evidentiary Sufficiency
          When reviewing a challenge to the legal and factual sufficiency of the evidence, we
apply two separate standards. In evaluating legal sufficiency, we consider all of the
evidence and any reasonable inferences in the light most favorable to the prevailing party
and determine whether the evidence as a whole rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Associated Indem. Corp.
v. CAT Contracting, Inc., 964 S.W.2d 276, 285–86 (Tex. 1998); Transp. Ins. Co. v. Moriel,
879 S.W.2d 10, 25 (Tex. 1994). We disregard all direct and circumstantial evidence
contrary to the finding, Lenz v. Lenz, 79 S.W.3d 10, 13 (Tex. 2002), requiring the party
attacking the legal sufficiency to demonstrate on appeal that there is no evidence to
support it, Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). We will sustain such a
challenge only when the record discloses: (1) a complete absence of evidence of a vital
fact, (2) the court is barred by rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no
more than a mere scintilla of evidence, or (4) the evidence established conclusively the
opposite of a vital fact. Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)
(citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38
Tex. L. Rev. 361, 362–63 (1960)).
          In evaluating factual sufficiency, we consider all of the evidence, including any
evidence contrary to the verdict. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406–07
(Tex. 1998); Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). The jury
itself is the sole judge of witness credibility and the weight to be given testimony,
McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986); however, when a party without
the burden of proof on an issue challenges the factual sufficiency of the evidence, the
question on appeal is whether the evidence sufficiently supports the jury's conclusions,
Gooch v. Am. Sling Co., 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ). That
is, as long as there is enough evidence before the fact-finder so that reasonable minds
could differ on the meaning of the evidence, or the inferences and conclusions to be drawn
from the evidence, it will be deemed factually sufficient. We will, however, sustain a factual
sufficiency challenge if the evidence is so weak or the verdict is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).
The Evidence in This Case
          Falconer's case is based on allegations that Cendant failed to disclose that the
house's foundation showed evidence of substantial movement (as opposed to minor
settlement) in the past and that Cendant failed to provide a complete copy of the relevant
engineer's report. He contends Cendant's actions were false, misleading, and deceptive,
constituted the producing cause of his economic damages, and were unconscionable. See
Tex. Bus. & Com. Code Ann. § 17.50(a)(1), (3) (Vernon 2002). Essentially, Falconer
argues he was misled by Cendant's agent because she only pointed out what she
considered to be the important parts of the homeowner's real estate disclosure and the
structural inspection report before he signed the contract, agreeing to buy the house. The
evidence, however, does not support this conclusion.
          Before Falconer ever made an offer on the house in question, Cendant's agent
provided him with a copy of the Gunnels Disclosure and a copy of the Downs Report. The
Gunnels Disclosure noted minor settlement had occurred, but that concrete piers were
installed to minimize additional movement of the foundation. The Downs Report further
explained:
The foundation shows evidence of a substantial amount of movement in the
past. There is a significant separation in the brick veneer mortar joints on the
right exterior wall approximately 12 ft. from the left front corner of the house. 
There are other minor cracks in the exterior and interior walls of the house. 
According to a report by a registered engineer . . . approximately 23 underpin
piers were installed around the perimeter of the house to prevent and
minimize foundation movement. It is my opinion that these foundation
underpins have been successful in minimizing foundation movement and the
cracks and separations that I observed, for the most part, existed prior to the
installation of the piers. It is my opinion that the foundation is now in a stable
condition and the house is structurally sound. Additional repairs or
stabilization work is not warranted.

(Emphasis added.) Despite Falconer's admission that he received and initialed at least
those portions of the documents describing the foundation's condition, he nevertheless
maintains that he was misled by Cendant's agent. He testified he would not necessarily
characterize what she affirmatively told him about the house as a misrepresentation of the
information available to her, but believed she misled him by selectively informing him of
certain portions of the Gunnels Disclosure and the Downs Report, omitting the fact that
substantial movement had taken place in the past. Instead, she reportedly pointed out
from the Gunnels Disclosure only that minor settlement had occurred in the past and then
jumped forward to the last two sentences of the Downs Report quoted above, indicating
that the foundation was stable, that the house was structurally sound, and that no
additional repairs were warranted. 
          The following testimony paints Falconer's perspective.
          Q        So you may have seen [the Downs Report], but you just didn't
read everything?

          A        That's possible.

          Q        Isn't it true, sir, that when you initial or sign something that
you're making a representation to someone that you received the document,
you read the document. You approve the document, understood the
document. Is that not what initials and signatures are for?

          A        That may be legally what they're for, but like I said, we went
through it and she pointed things out and said initial it and I initialled them
when she went through them.

          Q        Well, why would you initial something?

          A        Because she told me to.

          Q        So you just blindly initialled it when she told you to?

          A        Well, I relied on her to point out things that were important.

          Q        When you sign something are you not saying that you've read
it, reviewed it, and approved it?

          A        Well, I rely on people -- a real estate agent to point out what's
important.

In earlier testimony, Falconer explained:
          A        I think there is a difference in receiving [documents] and having
somebody go over them with you and say, you know, this is what it says right
here. Would you initial it please. I initial it.

          Q        . . . . You're trying to tell the ladies and gentlemen of this jury
as a first time home buyer you didn't read those reports in their entirety?

          A        Well, I relied on the real estate agent to tell me what was in
those reports.

          Q        So you're telling the ladies and gentlemen of the jury that you
did not read these?

          A        I did not read everything on every page.

          Q        If you've initialled something what do you think that implies to
folks who are looking at those documents later?

          A        That I had seen it.

          . . . .

          Q        You were present during the deposition of Sheila Manning
weren't you?

          A        Yes.

          Q        She was the Realtor involved in your sale; is that right?

          A        Yes.

          Q        You heard her testify that she gave you the entire Downs report
. . . before you made an offer on this house; is that right?

          A        Yes.

          Q        And you also heard her testify that she gave you those and told
you to go home and read all of them yourself before she would submit the
offer to Cendant?

          A        That may be, but again I didn't read everything on every page.

          . . . .

          Q        You heard Ms. Manning testify she gave you those complete
reports to go home and read. She had you come back and initial them as
having read them and now you're telling the jury that you never read them?

          A        I didn't read every word.

          Q        And that's Cendant's fault that you didn't read every word?

          A        No. It's not Cendant's fault.

          Q        Do you expect Cendant to sit down and read each -- the
contract through line by line with you?

          A        If that's what it takes.

          Despite Falconer's belief that Cendant's agent should have explained every detail
of the contract, including any disclosures or attached reports, this is simply not the law. 
Even where there exists a fiduciary relationship—which we do not have here—there is no
duty under the DTPA requiring sellers to orally disclose the contents of a written contract. 
See First City Mortgage Co. v. Gillis, 694 S.W.2d 144, 146–47 (Tex. App.—Houston [14th
Dist.] 1985, writ ref'd n.r.e.). The information provided in the Gunnels Disclosure and the
Downs Report was clear and unambiguous and subject to Falconer's review before
signing. "It is well settled that the parties to a contract have an obligation to protect
themselves by reading what they sign. Unless there is some basis for finding fraud, the
parties may not excuse themselves from the consequences of failing to meet that
obligation." Id. at 147; Amouri v. Southwest Toyota, Inc., 20 S.W.3d 165, 169 (Tex.
App.—Texarkana 2000, pet. denied) ("[E]very person [with legal] capacity . . . is held to
know what words were used in the contract, to know their meaning, and to understand their
legal effect.").
          While the exception to this rule will excuse even negligence in failing to read a
contract before signing, the exception applies only where one party's false representations
induce another party to contract. Id. at 170–71 (citing Plains Cotton Coop. Ass'n v. Wolf,
553 S.W.2d 800, 803 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.)). In this case, there
is no evidence of fraud; Falconer himself declined to characterize Cendant's explanation
of the relevant documents as a misrepresentation. Cendant's agent did not conceal any
pertinent information from Falconer; in fact, she disclosed in written form all of the
information she had regarding the house's foundation, and her oral explanations did not
contradict the written disclosures. Not only did Cendant effectively put Falconer on notice
that there had been prior settlement affecting the house's foundation, but it also informed
him that, to the best of its knowledge, any resulting problems had since been resolved.



          Falconer also complained at trial that Cendant failed to disclose the first two pages
of the Downs Report. Although these pages contained no information relevant to the
foundation settlement question earlier addressed (that information being found on page
five of the Downs Report), Falconer maintains he would not have relied on the report had
he seen these pages because they indicated the report was not intended for the use of
prospective buyers. If he had known that he was not meant to rely on the report, he could
have at least made the decision to hire another engineer or walk away from the deal
altogether. As with his first claim, however, the evidence does not support the conclusion
that Cendant failed to furnish Falconer with the complete report.
          Although Falconer testified that pages one and two of the report were missing when
he signed the earnest money contract, he later admitted he initialed these pages—along
with all of the other pages in the report—before purchasing the house. On cross-examination, Falconer testified as follows:
          Q        Take it back there and let's look at the U.S. Inspect structural
evaluation. I'll flip it back there for you. Looking at the original, is that your
initials on the bottom of that page?

          A        It appears to be my initials.

          Q        Well, you know your initials don't you? Those are your initials
aren't they?

          A        It appears to be.

          Q        This is the page that has the report is [sic] intended for use of
our relocation clients only right?

          A        Right.

          Q        You initialled that?

          A        It appears that I initialled it.

          Q        If you look at page two, the next one. Again, this is blue ink,
right?

          A        It's blue ink.

          Q        And that's what you signed all these documents in, blue ink. 
All earnest money contracts. Well, let's take a look. There is your signature,
blue I think, right. He's [sic] is page two here, this is the page that says the
structural inspection. Relocation clients are not intended -- for use of
perspective [sic] buyers or any interested party whatsoever is that right? 
That's what that says?

          A        Yes.

          Q        This is the page [you] contend you didn't get right?

          A        I didn't read it in its entirety.

          Q        But you initialled it?

          A        I initialled it.

          . . . .

          Q        No. I'm not trying to trick you or anything I just want to get in
the record that you did initial -- you initialled all the pages of the Downs
report right? One, two, three, four, five, and six. You initialled all those
pages?

          A        Yes.

          . . . .

          Q        One last question. If Sheila Manning says that she gave you
the complete report that I've marked as Defendant's Exhibit No. 1, which is
the colored copied one. If she said she gave you that complete report and
that you signed, initialled it and gave it back to her, you have no reason to
disagree with that would you?

          A        I have no reason to disagree that she might have given it to me
and I initialled it, but I don't ever remember reading over it.

The failure of one party to read a contract, or any of the materials appertaining to it,
however, does not equate with a failure of the other party to disclose the information
contained within the four corners of that contract. Absent a showing Cendant
misrepresented the information disclosed in written form, Falconer was obligated to protect
himself by reading the contract. He cannot now be excused from the consequences of
failing to meet that obligation. See Gillis, 694 S.W.2d at 147; Amouri, 20 S.W.3d at 169.
Conclusion
          Reviewing the evidence in the light most favorable to Falconer, we conclude there
is no evidence showing Cendant failed to disclose any information in an attempt to
fraudulently induce Falconer to contract. On the contrary, the evidence conclusively
establishes Cendant disclosed all matters material to Falconer's claims. Because there
is no evidence to support the jury's findings, we reverse the trial court's judgment and
render judgment that Falconer take nothing.
 
                                                                           Josh R. Morriss, III
                                                                           Chief Justice

Date Submitted:      March 31, 2004
Date Decided:         May 4, 2004